# Richmond.

## WHEELWRIGHT AND OTHERS v. COMMONWEALTH.

### January 26, 1905.

1. RICHMOND, FREDERICKSBURG & POTOMAC RAILROAD—*Parallel Road—
   Constitutional Provision.*—The purpose of the saving clause in sec.
   166 of the Constitution (1902), relating to paralleling the Richmond,
   Fredericksburg & Potomac Railroad, and of the act passed in pur-
   suance thereof, was merely to protect the State's interest in that
   railroad, by guarding against competition in the transportation of
   passengers between the city of Richmond and the city of Washing-
   ton, and not to prohibit the granting of a charter to build a rail-
   road which would parallel the line of the first mentioned road for
   about twenty miles out from the city of Richmond, and then reach
   out to the other points in the State not provided with railroad
   facilities.
2. STATUTES—*Construction—Obstructing Enterprise—Exception to Statu-
   tory Policy.*—Statutes which interfere with legitimate enterprises,
   or limit the right to construct or operate legitimate industries, or
   which constitute an exception to a well defined statutory policy,
   should be construed strictly.

Appeal from State Corporation Commission.

*Reversed.*

The opinion states the case.

*Munford, Hunton, Williams & Anderson,* for the appellants.

*Attorney-General William A. Anderson,* for the Common-
wealth.

CARDWELL, J., delivered the opinion of the court.

Thomas S. Wheelwright and others presented to the State Corporation Commission articles of association, in order that they might be incorporated under the corporate name of the Richmond & Chesapeake Bay Railway Company, the articles of association presented being in accordance with the requirements of section 2 of chapter II. of An Act Concerning Corporations, which became a law on the 21st day of May, 1903. Acts 1902-3-4, pp. 437-484.

The purposes of the incorporation are the construction and operation of two railroads, one from the city of Richmond to a point on the Rappahannock river, near Tappahannock, and, crossing the Rappahannock river, to have its terminus on the Chesapeake Bay at some point within the county of Northumberland, or the county of Lancaster; the other line, from the city of Richmond to a point on the Chesapeake Bay within the counties of Gloucester, Mathews or Middlesex, as may be selected by the company. As to both lines, the articles of association, in describing the route, provide that it shall be from within the city of Richmond, "thence through the counties of Henrico and Hanover, via the town of Ashland, or such other route as may be selected by said company." Following the words just quoted, there is a further description of the routes along which the proposed lines are to be run, but it is not necessary to the determination of the question presented to this court that they be set out here.

The town of Ashland is in Hanover county, about sixteen miles north of the city of Richmond, and the Richmond, Fredericksburg & Potomac Railroad Company has its line of railroad running from the city of Richmond to the town of Ashland, and beyond, through the county of Hanover, and further north. Under the proposed charter the applicants can con-

struct and operate a railroad parallel to the R., F. & P. railroad line as far as the town of Ashland, and up to the point where the latter road crosses the county line of Hanover county, the distance of which parallel line would be twenty miles, or a little more.

The application for a charter to construct this so-called parallel line to Ashland, thence to Tappahannock and other points northeast of Richmond, was refused by the State Corporation Commission, not because the charter applied for would, in fact, conflict with section 12 of chapter II. of the Act Concerning Corporations, *supra*, but might possibly conflict therewith, the Commission "perceiving no other objection to issuing the charter."

From the order of the Corporation Commission refusing to issue the charter, an appeal is taken to this court.

Section 166 of the present Constitution gives the right to every railroad company in the State, subject to such reasonable regulations as may be prescribed by law, to parallel, intersect, connect with, or cross with its roadway, any other railroad or railroads, but provides further as follows: "Nothing in this section shall deprive the General Assembly of the right to prevent by statute, repealable at pleasure, any railroad from being built parallel to the present line of the Richmond, Fredericksburg & Potomac Railroad Company." Pursuant to section 166 of the Constitution, the Legislature enacted section 12 of Chapter II. of the Act Concerning Corporations, *supra*, which provides: "No railroad company chartered under this act, or whose charter may be amended under this act, shall have power to build any railroad parallel to the line of the Richmond, Fredericksburg & Potomac railroad."

The contention of appellants is that the intention of the statute was to forbid the issuing of a charter to build a railroad reasonably and substantially parallel with the entire line of the

R., F. & P. Railroad Company, and that the statute cannot and should not be so construed as to prevent railroads, running from Richmond city to other parts of Virginia, from running a short distance in the same direction of the R., F. & P. railroad, and that such lines could not and would not in any way interfere with the R., F. & P. railroad.

It is manifest from the opinion of the Corporation Commission, made a part of the record before us, that the Commission considered the contention of appellants just set out as having great force, but denied the charter only for the reason, as the opinion states, that they deemed it best that the statute in question should be construed by this court, and its purpose and meaning finally fixed and settled. The opinion says:

"The great bulk of the business of the Richmond, Fredericksburg & Potomac railroad consists of through traffic, and it is doubtless true that the running either of an electric or steam railroad from Richmond to Ashland would not interfere with the business of the Richmond, Fredericksburg & Potomac railroad, but might, on the contrary, relieve it of local passenger business between Richmond and Ashland, which it would prefer to have handled by a local road. While it rather seems to us that the intention of the statute was not to forbid the chartering of a road such as that now asked for, yet we are of opinion that we should deny the charter asked for in these articles of incorporation. If the charter is granted and the corporation created, there seems to be no way in which the Commission can recall the charter, and it is extremely doubtful whether the validity of the charter could be called in question by any one, even by the Commonwealth itself, after the Commission has issued it. In this particular case the Commission takes this action because it has been intimated by the applicants that, if the charter is not granted, an appeal may be taken to the Supreme Court of Appeals. The Commission

deems it its duty to have the Court of Appeals pass upon this question as early as practicable, in order that it may be finally fixed and settled. Other applications may come before the Commission, and, although it would be inclined to grant them, it would greatly prefer, before finally putting its own construction upon this statue, to have its proper interpretation and meaning passed upon by our Court of Appeals."

In the original charter granted by the General Assembly February 25, 1834, to the R., F. & P. railroad, to construct its road from Richmond city to the town of Fredericksburg, it was provided among other things that the General Assembly, in the event of the completion of the said railroad within the time limited by the act, would not, for the period of thirty years from the completion of said railroad, allow any other railroad to be constructed between the city of Richmond and the city of Washington, or for any portion of said distance, the probable effect of which would be to diminish the number of passengers between the one city and the other, upon the railroad authorized by the act, or to compel the company, in order to retain such passengers, to reduce the passage money; "provided, however, that nothing herein contained shall be so construed as to prevent the Legislature, at any time hereafter, from authorizing the construction of a railroad between the city of Richmond and the town of Tappahannock, or Urbanna, or to any intermediate points between said city of Richmond and the said towns," etc.

On the 23d of March, 1848, the Legislature passed an act authorizing the Louisa Railroad Company, formerly chartered, and which had constructed and was operating its roads between Louisa Courthouse and the junction with the R., F. & P. railroad, in Hanover county, about twenty-five miles north of the city of Richmond, to extend its road westward, and also from the Junction to the dock in the city of Richmond, and in the

case of the *Richmond, &c. Railroad* v. *The Louisa Railroad Co.*, the validity of the last-named act was called in question as impairing the contractual rights of the first-named road, entered into between its original incorporators and the State, but the Superior Court of Chancery for the Richmond Circuit and this court took the opposite view, which view, on an appeal taken from the refusal of an appeal by this court from the decree of the Superior Court of Chancery denying an injunction to restrain the defendant from extending its road across the complainants' road at the Junction to the city of Richmond, was sustained by the Supreme Court of the United States, 13 How., p. 69, 14 L. Ed. 55.

The last-named court, in its opinion, after stating the well-settled rules of construction of all such acts, and referring to the provision contained in the original charter of the R., F. & P. Railroad Company above set out, says: "Construing this act with these principles in view, where do we find that the Legislature has contracted to part with the power to construct the railroad, even between Richmond and Fredericksburg, for carrying coal or other freight? Much less can they be said to have contracted that no railroad connected with the western part of the State shall be suffered to cross the complainants' road or run parallel to it, in any portion of its route. Such a contract cannot be elicited from the letter or spirit of this section of the act."

It will be observed that the act here under consideration makes no reference to building a railroad, the line of which might parallel a *part* of the R., F. & P. railroad, but makes reference only to the building of railroads parallel to the *line* of the R., F. & P. railroad. Since by an inspection of a map of the State of Virginia, it appears that a railroad cannot be built from the city of Richmond to the towns of Tappahannock or Urbana, or for the benefit and development of that portion

of Virginia in which those towns are situated, without paralleling to some degree the railroad owned and operated by the R., F. & P. R. Co., to construe the statute as inhibiting this would be equivalent to saying that the Constitutional Convention and the Legislature intended that there should be no railroad constructed from the city of Richmond to the northeastern portion of the State, a section as much in need of railroad facilities as any portion of the State is now or has been, and as much deserving and as much entitled to such facilities as any other section of the State. Such a construction would result disastrously to the State's interests, in that it would prevent the construction of local railroad lines, even for a mile or two miles north of the city of Richmond, in any direction, for they would in a sense parallel the R., F. & P. railroad, or at least a portion thereof, if they ran in a northern direction from Richmond. If such was the purpose of the Legislature, it is inconceivable that it would not have been so declared in express terms.

It is obvious also that it is greatly to the interest of the city of Richmond and of the whole section through which appellants' contemplated road would pass, that it be built; while, so far from interfering with the R., F. & P. railroad, such a road, by bringing the citizens and products of that section of northeast Virginia, which now has no railroad, to Richmond or to Ashland, and delivering the same to the R., F. & P. railroad for transportation to other points, would be of great benefit to that road, and would do it no possible injury. In fact, it should be stated in this opinion that the R., F. & P. Railroad Company entertains this view, and in no way is it opposing the granting of the charter desired by appellants.

For the want of modern transportation facilities, the counties in the northeastern section of the State are so cut off from Richmond as to be almost entirely tributary to the city of Bal-

timore, certainly to make the latter city more easily and conveniently reached than the former. The whole State has an interest in the industrial development of that section, and the facilities to be afforded by the railroad which appellants propose to construct should not be denied to a people having none such, if any other construction of the statute in question can be reasonably adopted.

Statutes which interfere with legitimate enterprise, or limit the right to construct or operate legitimate industries, must be construed strictly. And in like manner statutes which constitute an exception from a well-defined statutory policy are given a strict construction. Sutherland on Stat. Constr., sections 370 and 407.

By constitutional provisions and numerous statutes since 1865, whatever may have been the policy of the State prior to the Civil War, by which the State lent its resources and credit to works of internal improvements, the policy declared is that the greatest opportunity shall be given to private corporations to build railroads and other works of internal improvement for the development of the interests of the State. And while the Legislature has been careful to provide for the protection of the State's interest, as a stockholder, in the R., F. & P. railroad, neither in the policy in vogue since 1865, nor in the present Constitution, nor in the statute under consideration, are there any words or phrases used that would justify a denial of the charter applied for by appellants. The learned Attorney-General frankly stated when this case was submitted for the consideration of this court that it was not, in his opinion, to the interest of the Commonwealth to oppose the charter, and that it was neither the purpose of the constitutional provision nor the act in question to prevent the construction of such lines of railroad as proposed by appellants; that neither the letter nor the spirit of the act would be violated by the

granting to them of the charter they ask. This was practically the view taken by the State Corporation Commission, in which we fully concur.

The purpose of section 166 of the Constitution, and of the act, was merely to protect the interest of the Commonwealth in the R., F. & P. railroad, by guarding against competition in the transportation of passengers between the city of Richmond and the city of Washington, and not to prohibit the granting of a charter to build a railroad line such as is contemplated by appellants, although the railroad they purpose building, strictly speaking, will parallel the R., F. & P. railroad for a short portion of its line, but not its entire line, whereby the road, when built, would become a competitor of the R., F. & P. railroad for its through traffic between Richmond and Washington.

Whether or not the legislative act under consideration inhibits the granting of a charter to build a railroad paralleling the R., F. & P. railroad for a greater distance than is proposed by appellants, and whereby such paralleling road, when built, would become a competitor of the R., F. & P. railroad for its through traffic between Richmond and Washington, we are not called upon to express an opinion in this cause, nor has it been our purpose, in anything that has been said, to do so.

It follows that the order of the State Corporation Commission appealed from must be reversed, and the cause remanded to the Commission that it may issue the charter applied for by appellants.

*Reversed.*